FILED
IN OPEN COURT

JUN 1 4 2017

CLERK, U.S. DISTRICT COURT
NEWPORT NEWS, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 4:17cr |
| v. | FILED UNDER SEAL |
| ERNESTO F. LAMAR,<br>(Counts 1, 3, 6 – 16) | 18 U.S.C. §§ 1014 and 2<br>False Statements on Loan Application<br>(Counts 1- 5) |
| SONTIL ROSEBOROUGH,<br>(Counts 1 - 5) | 18 U.S.C. § 641<br>Theft of Government Property<br>(Counts 6 – 9) |
| Defendants. | 18 U.S.C. §§ 1343 and 2<br>Wire Fraud<br>(Counts 10 – 13) |
| | 18 U.S.C. §§ 1957 and 2<br>Engaging in Monetary Transactions in<br>Property Derived from Specified Unlawful<br>Activity<br>(Counts 14 – 16) |
| | 18 U.S.C. §§ 981 & 982 and<br>21 U.S.C. § 853(p)<br>Forfeiture |

INDICTMENT

June 2017 Term - At Newport News, Virginia

GENERAL ALLEGATIONS

At all times relevant to the Indictment:

Department of Veterans Affairs Disability Payments

1.    ERNESTO F. LAMAR (hereinafter "LAMAR") was a veteran of the United States

Armed Forces, having served in the United States Army from in or about December 11, 1981, to

in or about June 17, 1986.

1

2.     As a result of certain service-connected disabilities, LAMAR received an entitlement to individual unemployability benefits from the United States Department of Veterans Affairs (hereinafter "the VA"), effective March 24, 2010.    In order to establish entitlement to a total disability rating for compensation based on individual unemployability, a veteran must be unable to secure substantially gainful employment, which is defined as employment at which non-disabled individuals earn their livelihood with earnings comparable to the particular occupation in the community where the veteran resides.

3.     In order to establish to the VA that he did not have gainful employment, LAMAR reported that he had not worked full time since April 2009, that he had done consultant work approximately 3-4 hours each day from home for the past 18 months and that his earnings were between $800 and $1000 each month.    LAMAR was advised that if he began working full time, he should inform the VA so that his benefits could be adjusted.

4.     As a result of this entitlement determination, from on or about March 24, 2010 to on or about May 22, 2017, LAMAR received approximately $134,553.72 in benefits directly related to his individual unemployability determination.

5.     On or about August 31, 2015, March 15, 2016 and May 10, 2017 the VA sent LAMAR separate requests that he certify his continued unemployment and that he had not held gainful employment in the last 12 months.    LAMAR was required to provide this information within 60 days of each request; however, he failed to do so for at least 2015 and 2016.

6.     During various time-periods that he was receiving monthly individual unemployability benefits, LAMAR held gainful employment and received income through that employment.    LAMAR did not advise the VA that he held this employment and received the

2

aforementioned payments.    In correspondence sent from the VA, LAMAR was advised that there were criminal penalties for the fraudulent acceptance of payments to which he was not entitled.

<u>Vehicle Loans</u>

7.    At all times relevant to the indictment, LAMAR was involved in a relationship with SONTIL ROSEBOROUGH (hereinafter "ROSEBOROUGH"), the defendant herein.    At various times, the couple resided together in Virginia Beach and South Carolina.

8.    On or about January 31, 2013, ROSEBOROUGH applied for a vehicle loan from Port Alliance Federal Credit Union to purchase a 2008 Cadillac Escalade for the price of $41,498.00.    ROSEBOROUGH falsely claimed that her employment was with "BMK" (which was a reference to BMK Solutions, LLC – LAMAR's then employer) as an accountant earning $50,000 annually.    LAMAR was a co-applicant and claimed annual income of $48,000.    This loan application was rejected.

9.    On or about April 17, 2013, ROSEBOROUGH applied for a vehicle loan with Langley Federal Credit Union for the purchase of a Can Am Spyder motorcycle. ROSEBOROUGH falsely claimed on the loan application that she worked at BMK as an accountant, earning a salary of $75,000.00 annually.    LAMAR signed the installment sales contract as a co-owner.

10.    On or about September 21, 2013, ROSEBOROUGH applied for a vehicle loan with Port Alliance Federal Credit Union for the purchase of a 2013 Jaguar automobile at a total cash price of $53,900.00.    ROSEBOROUGH falsely claimed on the loan application that she worked at BMK as an accountant, earning an annual salary of $100,000.00.    In support of this application, ROSEBOROUGH produced a document entitled "Independent Contractor Agreement," that

3

purported to show a contractual employment between ROSEBOROUGH and BMK and signed by LAMAR for BMK.  This purported agreement was dated August 1, 2013, and called for compensation of $5,000.00 per month to be paid to ROSEBOROUGH for the term of the agreement.

11.    ROSEBOROUGH subsequently entered into an extension agreement on the loan for the 2013 Jaguar.  She claimed that she was employed by FC&T (another LAMAR owned business) since 2012, as an accountant earning $10,000 per month with LAMAR as her supervisor.

12.    On or about August 29, 2014, ROSEBOROUGH applied for a vehicle loan with Port Alliance Federal Credit Union for the purchase of a 2014 Hyundai Genesis automobile at a total cash price of $33,630.00.   ROSEBOROUGH falsely claimed on the loan application that she worked at BMK as an accountant, earning an annual salary of $105,000.00 annually.

13.    On or about November 29, 2014, ROSEBOROUGH applied for a vehicle loan with Wells Fargo Bank for the purchase of a 2015 Cadillac Escalade.   ROSEBOROUGH falsely claimed on the loan application that she had worked as an accountant for FC&T, LLC, for the past year, at a salary of $11,700.00 per month.

14.    On or about August 13, 2016, LAMAR applied for a vehicle loan with Wells Fargo Bank for the purchase of a 2016 Chevy Camaro.   LAMAR identified his current employment as a Construction Inspector with Corporate Environmental Risk Management (hereinafter "CERM"), with gross income of $72,800 per year and claimed to have been so employed for one month. LAMAR claimed that for six years he had been the owner of "FCT LLC."   LAMAR provided a letter from CERM documenting his offer of employment.   LAMAR also attached a letter from the VA, dated March 23, 2015, that summarized his benefits.

15.     On or about April 4, 2017, ROSEBOROUGH filed a Statement of Financial Affairs for Individuals Filing for Bankruptcy in the United States Bankruptcy Court for the District of South Carolina.    From January 1, 2015, through the date she filed for bankruptcy, ROSEBOROUGH claimed she had no income from any employment and only received voluntary child support and IRA distributions.

16.     On or about April 24, 2017, LAMAR resigned from CERM without notice.

### Employment at BMK and Diversion of Funds from Indect

17.     From in or about 2009 through at least in or about July 2015, LAMAR was a majority owner of BMK Solutions, LLC (hereinafter "BMK"), located in Virginia Beach, Virginia. LAMAR received regular payments from BMK.

18.     Indect Electronics & Distribution (hereinafter "Indect") is an Austrian based company that does business in the United States through its subsidiary, Indect USA.

19.     In or about January 2014, LAMAR, representing BMK, entered into a contract with Indect to complete a construction project on the Dallas-Fort Worth Airport parking structures in Dallas, Texas.    BMK was to manage various areas in completing the project, to include project management, paying subcontractors and vendors and communications with Indect.    The original contracted amount for the project was approximately $835,000.

20.     LAMAR and others sent billing invoices to Indect in Austria via e-mail. Payments from Indect were wired to BMK.    In June 2014, LAMAR sent an email to Indect requesting an overdue payment from an April 2014 invoice.

21.     In further connection with the project, on or about March 25, 2015, BMK sent Indect an invoice in the amount of $327,788.75.

5

22.    On or about July 13, 2015, LAMAR sent an email to Indect requesting an update on payment of the aforementioned invoice.    On July 14, 2015, LAMAR, via email, forwarded the previous day's request, entitled "2nd Request!"    Also on July 14, 2015, LAMAR sent a number of emails concerning the invoice payment and requesting routing numbers and payment details.

23.    On or about July 15, 2015, LAMAR emailed Indect twice asking for a copy of the "bank transfer slip."

24.    On or about July 15, 2015, Indect wired funds in the amount of $326,754.95 from Austria to a BMK commercial bank account (last four digits of account number 7657) at TowneBank in Newport News, Virginia.    The defendant and two others were signatories on the 7657 account.

25.    Upon receipt of the funds, LAMAR engaged in a series of further wire transfers that transferred the funds that BMK received from Indect to a number of different accounts controlled by LAMAR.    Specifically, LAMAR transferred the bulk of the funds, approximately $317,279.43, to a BMK operating account where LAMAR was the sole signatory (last four digits of account number 7894).    LAMAR transferred other funds from the 7657 account to another account he controlled.

26.    On or about July 16, 2015, at approximately 8:37 a.m., LAMAR advised Indect personnel and others via email that the wired funds included an overpayment and that he was on his way to the bank to correct.    Indect responded via email with the necessary information to return the funds.

27.    LAMAR travelled to TowneBank on July 16, 2015.    At approximately 12:36 p.m., he obtained a $10,000 check from the 7894 account.    At approximately 12:38 p.m., he obtained

a cashier's check in the amount of $25,000 from the 7894 account.   At approximately 12:51 p.m.,
LAMAR transferred $276,302.41 of the funds from the 7894 account to a personal account opened
the same day(last four digits of account number 5641).   LAMAR subsequently used these funds
for personal use until the account was restrained on or about September 4, 2015.   LAMAR
transferred an additional $4,300 of the subject funds from the 7894 to an account ending in 9781
in the name of FC&T LLC.   No effort was made, however, by LAMAR to return the diverted
funds.   Furthermore, no vendors or contractors were paid from the wired funds.

The Scheme and Artifice

28.     During his tenure at BMK in or about at least July 2015, LAMAR created a scheme
and artifice to obtain United States currency by fraudulently diverting funds wired into a BMK
commercial account (last four digits of account 7894) for his own benefit and use, contrary to the
represented purposes of the funds.

29.     It was a part of the scheme and artifice that LAMAR, in the course of his
employment at BMK, caused the diversion of approximately $326,754.95, in funds that had been
wired from Indect to BMK for the purposes of advancing the objectives related to their contractual
agreement and paying vendors and subcontractors.

30.     It was further a part of the scheme and artifice that LAMAR used various bank
accounts at TowneBank and other financial institutions in an effort to transfer and divert the Indect
payment.

31.     It was further a part of the scheme and artifice that LAMAR sent and caused to be
sent a lulling / diversionary email to Indect prior to the fraudulent transfer of the funds.

7

32.    It was further a part of the scheme and artifice that LAMAR caused wire transmissions in interstate commerce to occur between the Eastern District of Virginia and locations located outside of the Commonwealth of Virginia.

COUNTS ONE THROUGH FIVE

THE GRAND JURY CHARGES THAT:

1.      The Grand Jury realleges and incorporates by reference the General Allegation
section contained above, as if fully set forth herein.

2.      On or about the dates set forth herein, in the Eastern District of Virginia,

SONTIL ROSEBOROUGH and ERNESTO LAMAR, the defendants herein, aided and abetted by
one another, knowingly made the following false statements for the purpose of influencing the
action of Port Alliance Federal Credit Union and Langley Federal Credit Union, each a Federal
credit union, and Wells Fargo Bank, an institution whose accounts are insured by the Federal
Deposit Insurance Corporation, in connection with the loan and credit applications described
herein:

| Count | Defendant(s) | Date (on or about) | Description/Purpose of Transaction |
|---|---|---|---|
| 1 | ROSEBOROUGH, LAMAR | 1/31/2013 | ROSEBOROUGH and LAMAR made false statements as to ROSEBOROUGH's employment and earnings in connection with a vehicle loan application at Port Alliance Federal Credit Union. |
| 2 | ROSEBOROUGH | 4/17/2013 | ROSEBOROUGH made false statements as to her employment and earnings in connection with a vehicle loan application at Langley Federal Credit Union. |
| 3 | ROSEBOROUGH, LAMAR | 9/21/2013 | ROSEBOROUGH made false statements as to her employment and earnings in connection with a vehicle loan application at Port Alliance Federal Credit Union supported by a false employment agreement signed by ROSEBOROUGH and LAMAR. |
| 4 | ROSEBOROUGH | 8/29/2014 | ROSEBOROUGH made false statements as to her employment and earnings in connection with a vehicle loan application at Port Alliance Federal Credit Union. |

9

| 5 | ROSEBOROUGH | 11/29/2014 | ROSEBOROUGH made false statements as to her employment and earnings in connection with a vehicle loan application at Wells Fargo Bank. |
|---|---|---|---|

(In violation of Title 18, United States Code, Sections 1014 and 2).

## COUNTS SIX THROUGH NINE

THE GRAND JURY FURTHER CHARGES:

1.　　The Grand Jury realleges and incorporates by reference the General Allegation section contained above, as if fully set forth herein.

2.　　Beginning in or about April 2010, and continuing through in or about May 2017, as set forth below, within the Eastern District of Virginia and elsewhere, ERNESTO F. LAMAR, the defendant herein, did willfully and knowingly steal, purloin and knowingly convert to his own use property belonging to the United States and of an aggregate value in excess of $1,000.00, to wit: the defendant accepted individual unemployability benefits from the Department of Veterans Affairs during time periods where the defendant had obtained and received payments from gainful employment as follows:

| Count | Date of Payment (on or about) | Amount of OverPayment |
|-------|-------------------------------|-----------------------|
| 6 | February 28, 2014 | $1,577.81 |
| 7 | April 1, 2014 | $1,577.81 |
| 8 | May 1, 2014 | $1,577.81 |
| 9 | May 30, 2014 | $1,577.81 |

(In violation of Title 18, United States Code, Section 641).

11

COUNTS TEN THROUGH THIRTEEN

THE GRAND JURY FURTHER CHARGES THAT:

1.     The factual allegations contained in the General Allegations section are incorporated herein by reference as if set out in full.

2.     On or about the dates set forth below, for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, in the Eastern District of Virginia and elsewhere, ERNESTO F. LAMAR, the defendant herein, did knowingly and willfully transmit and cause to be transmitted by means of wire communication in interstate commerce, certain signs, signals, and sounds, that is emails and wire transfers from/to computers and banking institutions located outside the Commonwealth of Virginia from/to a computer or computer server and banking instutions located in the Eastern District of Virginia:

| Count | Date (on or about) | Description of Wire Transmission |
|---|---|---|
| 10 | 7/14/2015 | Email sent from LAMAR to Indect requesting information on Indect payment due BMK |
| 11 | 7/15/2015 | Emails sent from LAMAR to Indect requesting information on Indect payment to BMK |
| 12 | 7/15/2015 | Wire transfer of $326,754.95 from Indect in Austria to TowneBank account (last four digits of account 7657) in Newport News, Virginia |
| 13 | 7/16/2015 | Email sent from LAMAR to Indect regarding the overpayment. |

(In violation of Title 18, United States Code, Sections 1343 and 2).

12

COUNTS FOURTEEN THROUGH SIXTEEN

THE GRAND JURY FURTHER CHARGES THAT:

1.     The factual allegations contained in the General Allegations section of this Indictmentare incorporated herein by reference as if set out in full.

2.     On or about the following dates and in the manner described below, in the Eastern District of Virginia, ERNESTO F. LAMAR, the defendant herein, did knowingly engage and attempt to engage in the following monetary transactions by, through and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, money deposits which represented fraudulently obtained funds from investors, such property having been derived from a specified unlawful activity, that is Wire Fraud in violation of Title 18, United States Code, Section 1343:

| Count | Date (on or about) | Financial Transaction |
|-------|-------------------|-----------------------|
| 14 | 7/15/2015 | Transfer of $317,279.43 from TowneBank account (account number ending 7657) to TowneBank account (account number ending 7894) |
| 15 | 7/16/2015 | Transfer of $276,302.41 from TowneBank account (account number ending 7894) to TowneBank account (account number ending 5641) |
| 16 | 7/16/2015 | Obtaining of cashier's check in the amount of $25,000 from TowneBank account (account number ending 7894) |

(In violation of Title 18, United States Code, Section 1957.)

FORFEITURE ALLEGATION

THE GRAND JURY FURTHER ALLEGES AND FINDS PROBABLE CAUSE THAT:

1.      The defendant, if convicted of any of the violations alleged in Counts 1 through 13 of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to any of the violations.

2.      The defendant, if convicted of any of the violations alleged in Counts 14 through 16 of this Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved in any of the violations, or any property traceable to that property.

3.      If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

4.      The property subject to forfeiture includes, but is not limited to, the following property:

a.      A monetary judgment in the amount of not less than $461,308.67 representing the proceeds of the scheme alleged in Counts 1 through 4 and 10 through 13;

b.      $190,119.77 seized from TowneBank account # 0233115641;

c.      $156.38 seized from TowneBank account # 0233113916; and

d.      $156.79 seized from TowneBank account # 0233113975.

(In accordance with Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and 982(a)(2); Title 28, United States Code, Section 2461.)

14

UNITED STATES v. ERNESTO F. LAMAR, 4:17cr 66

A TRUE BILL:

*Redacted*

FOREPERSON

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____

Brian J. Samuels
Assistant United States Attorney
Virginia State Bar No. 65898
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
Tel. (757) 591-4000
Fax: (757) 591-0866